977 So.2d 1 (2008)
In re C.E.F. Applying For Intrafamily adoption of T.W.W.[1]
No. 2007 CJ 0992.
Court of Appeal of Louisiana, First Circuit.
September 14, 2007.
Opinion on Appeal after Remand February 8, 2008.
*2 C. Jerome DÁquila, New Roads, Counsel for Plaintiffs-Appellees C.E.F. and B.L.S.F.
Andrew J. DÁquilla, Toby Aucoin, Jackson, Counsel for Defendant-Appellant B.W.W.
Before: WHIPPLE, GUIDRY, and HUGHES, JJ.
GUIDRY, J.
A biological father[1] appeals a judgment in a proceeding for intrafamily adoption of his minor child by the spouse of the child's biological mother; however, in reviewing this matter, we find the judgment appealed is defective, and we hereby remand this matter to the trial court for the limited purpose of signing a valid written judgment that includes appropriate decretal language.
The January 5, 2007 judgment appealed herein contains the following rulings:
IT IS ORDERED, ADJUDGED AND DECREED that the consent of [B.W.W.] is not necessary for the final decree of adoption.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that it is in the child's best interest that he be adopted by [C.E.F.].
Thereafter, except for a statement as to where and when the judgment was read, rendered, and signed, the judgment contains no other decretal language. Notably, the judgment contains no language terminating the biological father's parental rights, nor decreeing that the child be deemed the child of the adoptive parent. Absent such language, the judgment is *3 defective. Accordingly, we remand this matter to the trial court to reform the judgment to include appropriate decretal language and further order the trial court to supplement the record on appeal with the reformed judgment within 30 days of the date of this action. Assessment of appeal costs is to await a final determination of this appeal.
REMANDED WITH INSTRUCTIONS.
GUIDRY, J.
A biological father appeals a judgment in a proceeding for intrafamily adoption of his minor child by the spouse of the child's biological mother. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
On January 27, 1998, B.L.S. gave birth to T.W.W., whose father was B.W.W.B.L.S. was still in high school at the time T.W.W. was born. B.L.S. and B.W.W. were not married. After completing high school, B.L.S. and T.W.W. moved in with B.W.W. and his parents in Denham Springs, Louisiana, and B.L.S. began attending Louisiana State University in Baton Rouge. B.L.S., B.W.W. and T.W.W. lived with B.W.W.'s parents until 2001, when they moved to Livonia where they leased a home.
While residing in Denham Springs, B.L.S. and B.W.W.'s relationship was hostile and characterized by frequent arguments. The relationship further deteriorated once the couple moved to Livonia. Particularly, B.W.W., who was known to have a bad temper, would throw or hit things, thereby damaging the object, when angry. The couple finally separated in March or April 2002, after B.W.W. became so angry that he damaged and destroyed several items of furniture and furnishings in the home the couple was leasing, including a door, walls, a television, and B.L.S.'s computer. B.W.W. was arrested as a result of that incident.
Although initially there was some attempt to reconcile, when B.W.W. exhibited another display of his violent temper while B.L.S. and T.W.W. were visiting with him and his parents at his parents' home in St. Francisville following the separation, attempts at reconciliation were terminated, and B.L.S. filed a petition for joint custody and to establish visitation rights in July 2002. Following a hearing on the petition, the couple was granted joint custody of T.W.W., with B.L.S. being designated the domiciliary parent, in a judgment dated October 22, 2002. That judgment also ordered B.W.W. to pay $344.00 per month in child support.[2]
In the meantime, around Easter 2002, B.L.S. began dating C.E.F. and C.E.F. also developed a close and loving relationship with T.W.W. during the course of their dating. In November 2003, C.E.F. married B.L.S. (hereinafter "B.L.S.F.").
On March 17, 2004, B.L.S.F. filed a rule for contempt and to modify custody, alleging that B.W.W. had only paid the sum of $980.00 in child support since February 2003. B.L.S.F. also alleged that B.W.W. had been terminated from his job for testing positive for illegal drug use and that he *4 was in an abusive relationship with his girlfriend, and as such, that the custody rights granted B.W.W. should be modified to grant him restricted visitation supervised by his parents. The parties later entered into a stipulated judgment on May 5, 2004, wherein the child support award was reduced to $344.00 per month, payable on the first, and arrearages were set at $4,180.00, to be paid at the rate of $100.00 per month. The parties also agreed that B.W.W. would submit to random drug testing and that he would not exercise visitation with T.W.W. in the presence of his then girlfriend. The hearing officer deferred sentencing B.W.W. on the rule for contempt and reset the matter for review on August 25, 2004.
The August 25, 2004 hearing date was continued to September 22, 2004, on which date counsel for B.L.S.F. agreed to present the hearing officer with an income assignment order, and B.W.W.'s sentencing for contempt was continued until January 5, 2005. On January 5, 2005, an income assignment order was signed by the hearing officer and B.W.W., and thereafter the hearing officer recommended that B.W.W. be sentenced to six months in jail for failure to pay child support. Sentencing by the trial court was scheduled for February 11, 2005, but B.W.W. did not appear in court because he was working out of state. Thus, a bench warrant was issued for his arrest. B.W.W. returned to the state two weeks after the February 11, 2005 hearing date.
In April 2005, B.W.W. was arrested on the charge of second offense driving while intoxicated and was sentenced to serve six months in prison on that charge and on a prior probated first offense charge. B.W.W. completed the combined sentences in September 2005. After getting out of prison, B.W.W. obtained employment and also sought to re-establish visitation with T.W.W.
In 2006, C.E.F. and B.L.S.F. allowed B.W.W. to exercise unsupervised visitation with T.W.W. on only two occasions, one being a short visit in a local park and the other visit being an overnight stay. Beginning in mid-2006, B.W.W. also began remitting lump sum child support payments to B.L.S.F., but she would not accept the payments. Instead, she advised B.W.W. to seek legal counsel. In August 2006, B.W.W. filed a rule to show cause why the custody judgment should not be enforced and why B.L.S.F. should not accept the child support payments and arrearages tendered by him.
On September 1, 2006, C.E.F. filed a petition for the intrafamily adoption of T.W.W. B.L.S.F. later joined in the petition as a party plaintiff as required by Title 12 of the Louisiana Children's Code. See La. Ch.C. art. 1243. B.W.W. filed an answer opposing the petition for intrafamily adoption, and later filed a motion seeking to have the intrafamily adoption matter consolidated with the rule filed by him in August 2006. The trial court initially granted the motion by ex parte order, but later set aside the order after B.L.S.F. filed a motion opposing the order. Thus, the matter proceeded to trial on November 2, 2006, solely on the petition for intrafamily adoption.[3]
After taking the matter under advisement, the trial court determined that the provisions of La. Ch.C. art. 1245 had been met so that B.W.W.'s consent to the adoption was not necessary. The trial court then found that it was in the best interest of the child to terminate B.W.W.'s parental rights and grant the petition for adoption. *5 It is from this adverse judgment that B.W.W. appeals.[4]

ASSIGNMENTS OF ERROR
B.W.W. contests the trial court's ruling in this matter in the following respects:
1. The trial court [committed] manifest error in determining that it was in the best interest of T.W.W. to be adopted by [C.E.F.] and the trial court further [committed] manifest error by denying visitation of his biological father [who] has maintained a continuous and meaningful relationship with the minor child his entire life.
2. Non support of T.W.W. in and of [itself] is not enough to allow the adoption of the minor child.

DISCUSSION
At the outset, we note our agreement with the assertion made by B.W.W. in his second assignment of error that nonsupport alone is an insufficient basis for terminating a natural parent's parental rights and granting a decree of adoption. In the petition for adoption, C.E.F. alleged that B.W.W. had failed to support and failed to visit, communicate, or attempt to communicate with T.W.W. for a period in excess of six months after the October 22, 2002 judgment. Louisiana Children's Code article 1245 provides:
A. The consent of the parent as required by Article 1193 may be dispensed with upon proof of the required elements of either Paragraph B or C of this Article.
* * *
C. When the spouse of a stepparent petitioner has been granted sole or joint custody of the child by a court of competent jurisdiction or is otherwise exercising lawful custody of the child and any one of the following conditions exists:
(1) The other parent has refused or failed to comply with a court order of support without just cause for a period of at least six months.
(2) The other parent has refused or failed to visit, communicate, or attempt to communicate with the child without just cause for a period of at least six months.
At trial, counsel for C.E.F. and B.L.S.F. acknowledged that although they had alleged both grounds of La. Ch.C. art. 1245(C) for dispensing with B.W.W.'s consent, they were mainly asserting "the support angle." Thereafter, counsel for B.W.W. stipulated that a six month time period had elapsed in which B.W.W. had failed to comply with the court order of support. Moreover, the evidence presented established that in addition to not having paid support for the entire year of 2005, even prior to that he had several periods of at least three months or more in which he failed to pay any amount in child support.[5]
Yet, irrespective of a parent's failure to pay a court-ordered child support obligation, there still must be a showing that terminating the natural parent's parental rights and granting the intrafamily adoption is in the best interest of the *6 child. In re Miller, 95-1051, p. 6 (La. App 1st Cir. 12/15/95), 665 So.2d 774, 777, writ denied, 96-0166 (La.2/9/96), 667 So.2d 541. Whether an adoption is in a child's best interests must be decided on the unique facts of each case, and the trial judge is vested with vast discretion in making that determination. However, the trial judge's discretion is not absolute, as the court's decision is subject to reversal if found to be manifestly erroneous or clearly wrong. In re Morris, 39,523, p. 8 (La.App.2d Cir.1/26/05), 892 So.2d 739, 744. Thus, in considering B.W.W.'s first assignment of error, we must consider whether the trial court was clearly wrong in finding that it was in the best interests of T.W.W. to terminate B.W.W.'s parental rights and to decree T.W.W.'s adoption by C.E.F.
This court has held that the most important factors in determining whether the granting or denying of the petition for adoption would be in the best interest of the child are the child's relationships with the stepparent and the natural parent not married to the stepparent. It is not enough to examine the love and home environment provided by the petitioner/stepparent. The court must also examine the depth of closeness of the child's ties with the noncustodial natural parent, and the effect which the loss of this relationship would have on the child. Further, the court must consider the seriousness and finality of the severing of the relationship between the parent and child, as well as the importance and benefit to the child of a continued relationship with the parent. In re J.A.B., 04-1160, p. 9 (La.App. 1st Cir.9/17/04), 884 So.2d 678, 684, writ denied, 04-2963 (La.12/14/04), 888 So.2d 848.
There were several significant circumstances in this matter that influenced the trial court's determination of whether it was in the best interests of T.W.W. to grant the petition for intrafamily adoption and to terminate B.W.W.'s parental rights. B.W.W. had a history of violent and destructive behavior, which on several occasions he had displayed before the minor child, with the last episode of such behavior having occurred sometime in 2005.[6] The trial court also looked critically at the fact that B.W.W. was living with his girlfriend at the time of trial and that he had not exercised unsupervised visitation with T.W.W. since February 2006 and only limited supervised visitation in May 2006.
The trial court also interviewed T.W.W. outside of the presence of any of the parties or counsel for the parties. During that interview, T.W.W. disclosed that he loved C.E.F., B.L.S.F., B.W.W. and his paternal grandparents. T.W.W. was asked to rate his relationship with each of the aforementioned persons on a scale of one to ten, with "ten" being the best, and "one" being not too good. T.W.W. rated his relationship with everyone but B.W.W., as a "ten." He rated his relationship with B.W.W. as a "four," stating that B.W.W. used to do such "bad stuff' as "holler, and scream and cuss in front of me." T.W.W. further recalled the incident when B.W.W. *7 broke a door at his grandmother's house and stated that he spent very little time with B.W.W.
C.E.F., on the other hand, had been a constant presence in T.W.W.'s life since he first began dating B.L.S.F. in 2002. T.W.W. acknowledged how C.E.F. helped to take care of him and even helped him with his homework. T.W.W. also told the trial court that he loves C.E.F. because he "does nice things" and described how C.E.F. took him hunting, fishing, and to the movies and had purchased a fourwheeler for him at Easter.[7]
To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. In re J.A.B., 04-1160 at 13, 884 So.2d at 686. Although we might not have reached the same determination, we cannot say that a reasonable factual basis does not exist in the record for the trial court's finding that it would be in the best interest of T.W.W. to allow the intrafamily adoption by C.E.F. and to terminate B.W.W.'s parental rights.
The record does reveal that C.E.F. and B.L.S.F. placed restrictions on B.W.W.'s visitation that were clearly beyond what was authorized by the joint custody decree in effect. However, the fact that B.W.W. elected not to take any steps to legally enforce his rights under the joint custody decree because of the substantial arrearages he owed, and his repeated failure to make any meaningful payment of his child support obligation, even after B.L.S.F. had filed the rule for contempt, which he knew could affect his custody rights, weaken his assertion that his failure to have any meaningful and consistent visitation with T.W.W. was largely the fault of C.E.F. and B.L.S.F. See In re T.A.S., 04-1612, p. 8 (La.App. 1st Cir.10/29/04), 897 So.2d 136, 141. We therefore reject the arguments raised by B.W.W. in this appeal.

CONCLUSION
Thus, based on the evidence presented, we cannot say the trial court was manifestly erroneous in finding that it was in the best interest of T.W.W. to allow the intrafamily adoption by C.E.F. and to terminate B.W.W.'s parental rights. Accordingly, we affirm the judgment of the trial court. All costs of this appeal are assessed to the appellant, B.W.W.
AFFIRMED.
Hughes, J., dissents and assigns reasons.
HUGHES, J., dissenting.
I respectfully dissent. This is not a custody case. It is a termination of parental rights, the legal severance of the biological relationship of a father and a son.
The majority opinion acknowledges that the petitioners restricted the father's visitation and refused his attempts to pay child support. The mother has a duty to foster the relationship between father and child. While we cannot ignore the fact that the father was incarcerated in 2005 on a DWI charge, it also appears that he has never ceased trying to do the right thing toward his child.
Buying a kid a four wheeler does not make one the "real dad." Love from an *8 imperfect source need not be rejected if the child is otherwise protected. The proposed adoption is not in the child's best long-term interest. Who really "benefits" here?
NOTES
[1] Pursuant to Rules 5-1 and 5-2 of the Uniform Rules  Courts of Appeal, the initials of the parties involved will be used to protect the minor's identity.
[1] Pursuant to Rules 5-1 and 5-2 of the Uniform Rules  Courts of Appeal, the initials of the parties involved will be used to protect the minor's identity.
[2] Because there was a delay between when the hearing officer's rendition of the award for child support in open court and the signing of a written judgment by the trial court, B.L.S. appealed the ruling of the hearing officer and sought to have an award of child support set by the trial court on October 14, 2002. A hearing on that appeal of the hearing officer's judgment was held in December 2002, and a second judgment for child support was rendered on January 16, 2003, ordering B.W.W. to pay the sum $701.00 a month as child support beginning February 15, 2003.
[3] Consequently, the actions of the trial court in regard to the rule filed by B.W.W. are not pertinent to the matter before us and will not be further discussed herein.
[4] On initial presentation, the original judgment for adoption signed by the trial court on January 5, 2007, was found to be defective based on a lack of proper decretal language, and the case was remanded to trial court to reform the judgment and to supplement the record on appeal with the reformed judgment, which judgment we now consider.
[5] According to the record, even when B.W.W. would remit payment, it would be in amounts far less than what was ordered.
[6] In that incident, B.W.W. and his mother, D.W., testified that he was angered by his mother's refusal to allow him to take T.W.W. on a last-minute trip to Baton Rouge that he had proposed. D.W. testified that she did not allow B.W.W. to take T.W.W. because she had made arrangements with C.E.F. to return T.W.W. by a certain time. During that confrontation, B.W.W. grabbed D.W. roughly by her upper arms when she questioned whether he was "on drugs" in the presence of T.W.W. and ordered her not to make such claims in front of his son, which D.W. acknowledged as a mistake. The two further testified that in his anger, B.W.W. "tore up" the screen door as he was exiting the house, and caused gravel to "fly" and shatter the rear window of D.W.'s Suburban when he "peeled out" of the driveway.
[7] While not determinative of the issues herein, we note that when asked did he want C.E.F. to be his real dad, even though B.W.W. was his real dad, T.W.W. replied "[y]es, sir." On a scale of one to ten, with "ten" meaning that it was what he really desired, T.W.W. stated that he rated his desire for C.E.F. to be his real dad a "ten." T.W.W. was two months shy of his ninth birthday at the time of trial.